## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| TWAIN D. VAUGHN #401689, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 16-cv-02598 |
| | ) | |
| GRADY PERRY, | ) | Hon. Matthew F. Leitman |
| | ) | |
| Respondent. | ) | |

## OPINION AND ORDER (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS (ECF #1), (2) DENYING PETITIONER'S MOTION TO EXPAND THE RECORD (ECF #25-1), (3) DENYING A CERTIFICATE OF APPEALABILITY, AND (4) GRANTING PERMISSION TO APPEAL *IN FORMA PAUPERIS*

Petitioner Twain D. Vaughn is a state prisoner in the custody of the Tennessee Department of Correction. On September 26, 2016, Vaughn filed a petition for a writ of habeas in this Court pursuant to 28 U.S.C. § 2254. (*See* ECF #1.) In the petition, Vaughn challenges his state-court convictions of reckless homicide, first-degree felony murder, aggravated robbery, and attempted aggravated robbery. (*See id.*) The trial court sentenced Vaughn to a life sentence with the possibility of parole. (*See id.* at 2; ECF #10-16 at 1.)

The Court has reviewed Vaughn's petition and concludes that he is not entitled to federal habeas relief. Accordingly, the Court will **DENY** his petition and **DENY**

1

his motion to expand the record. The Court will also **DENY** Vaughn a certificate of appealability. But it will **GRANT** him permission to appeal *in forma pauperis*.

I

On December 14, 2005, a Davidson County jury convicted Vaughn of one count each of reckless homicide, first-degree felony murder, and aggravated robbery, and two counts of attempted aggravated robbery. (*See* ECF #20-1 at 49–54.) The Tennessee Court of Criminal Appeals summarized the evidence at trial as follows:

> The Defendant's convictions were the result of a shooting in Nashville. Four individuals were driving towards downtown Nashville when they stopped in the parking lot of a vacant building, and, as they waited in the car, four young men approached the car. Two of the young men and three of the passengers all testified at trial that the Defendant then attempted to rob the passengers and that he shot and killed one of the passengers. Specifically, the following evidence was presented at trial:

> Kandice Regina Smith testified she lived in North Carolina, and she came to Nashville in July 2004 to see her brother, Kris Carlyle, the victim, along with her mother, Kathy Smith, and her boyfriend, Paul Puckett. The night of July 7, 2004, the four of them drove around the city "sightseeing" in Smith's mother's two-door Chrysler Lebaron. Smith's mother drove, Carlyle sat in the front passenger seat, Smith sat behind her mother, and Puckett sat behind Carlyle.

> Smith testified they found themselves lost, and they stopped because four young black men walked into the

2

road. Carlyle rolled down his window to attempt to ask for directions, and the young men instructed them to pull off the road. They pulled the car into the parking lot of a vacant restaurant, and three of the young men walked up to the car. Smith testified that, suddenly, the fourth man "c[a]me out of nowhere and put a gun in the car and demanded our money." Carlyle gave the man ten dollars. Smith described the gun as a dark revolver. Smith stated, "Then he pointed the gun at my boyfriend and asked him for his money and he told him he didn't have any. Then he pointed the gun at me and asked me for my money and I told him I didn't have any, and then he turned back and pointed the gun at my brother and shot him" once in the neck. The other three young men did not participate in the robbery or say anything to the passengers.

The car sped away, and the group eventually found a hospital. The police arrived at the hospital where they discussed the situation. Later that night, the passengers and the police returned to the location of the shooting to search for evidence. Two days later, Smith met with Detective Coleman, who presented her with a photo lineup. She identified the Defendant as the shooter from the pictures. Smith testified that none of the other three young men appeared to have a weapon.

On cross-examination, Smith explained that they arrived at the vacant lot because they turned off the main road in order to ask directions. They first met Detective Coleman at the hospital, they took him to the crime scene, and they then went to the station to be interviewed. Smith admitted that the shooter may have been wearing red, and, when pressed about the shooter's hair style, Smith stated, "you could braid it[—]it looked like, it just wasn't done." Additionally, Smith told Detective Coleman there appeared to be a young man with "cornrows" who first approached the car.

Paul Nelson Puckett, Jr., testified to the same background information as Smith. Specifically, he stated they were driving on a "fairly big road" towards downtown Nashville. As they were driving, there were "[j]ust four people, just, basically, making their way across the road, and we had to basically either stop or run over them." Carlyle was going to ask for directions, but the young men motioned for the car to pull off the road. Puckett described everything as happening very quickly. There were four young black men, and three of the young men walked up to Carlyle's side of the car. Then, the fourth man walked up and "put [ ] a gun through the window and demand[ed] some money." Carlyle gave the man ten dollars. After getting money from Carlyle, the man demanded money from Puckett and Smith, and he then turned and shot Carlyle.

They sped off and ultimately found someone to lead them to a hospital. Carlyle did not talk during the short trip to the hospital. Later, Puckett met with Detective Coleman and reviewed photographs of individuals in a line-up format. Puckett picked out two individuals, one being the Defendant and the other an unassociated individual. In court, Puckett identified the Defendant as the shooter.

On cross-examination, Puckett explained he could not remember if he told Detective Coleman that the Defendant was the shooter when he was interviewed. After reviewing a tape of the interview outside the presence of the jury, Puckett admitted that he did not positively identify the Defendant as the shooter during the initial interview. In further describing the shooter, Puckett stated that the shooter wore red, had "cornrows," was the tallest, and looked the oldest. On redirect-examination, Puckett stated that the Defendant's hair was different in court than when he first identified the Defendant.

Kathy Smith, the victim's mother, testified that Carlyle was an aspiring singer/songwriter living in the Nashville metropolitan area when he was killed. On the night in question, the group was driving downtown so Carlyle could sing and play his guitar. Kathy Smith stated that they found themselves lost and saw a "perfect opportunity to stop and ask for directions" when they saw four young men in the road. Carlyle rolled down his window when the young men motioned the car to pull off the road to get out of traffic. Three of the young men approached the car and then the fourth man approached. The first three did not appear to be armed, but the fourth man pointed a revolver at Carlyle and demanded money. Carlyle gave the man ten dollars, but the other occupants of the car did not have any money. He then pointed the gun at Carlyle and shot once. Kathy Smith testified that she could not identify the shooter because she could not see his face from where she was sitting.

Kathy Smith testified that they asked Carlyle if he had been hit, and, when he turned, blood "gushed" from his mouth; he could not speak. They found someone to lead them to the hospital, but Kathy Smith believed her son died during the car ride to the hospital.

On cross-examination, Kathy Smith testified that she did not recall telling an officer at the hospital that the three young men approached the car with "small plastic bags." She stated that they were traveling downtown for Carlyle to play his guitar on the corner for money. She also again admitted that she could not identify the shooter.

DeEarl Huddleston testified that he was seventeen years old and was familiar with the First Avenue and Lafayette Street area in Nashville. Huddleston stated that, on July 7, 2004, he was in that area with three friends, Ja Marable, Ta Marable, and the Defendant. They were walking from Lafayette Street to their neighborhood when they saw the

automobile in which the victim was riding. Huddleston testified that they were about to cross the street when the individuals "stopped and asked if we had any drugs to sell them." Huddleston did not recall specifically which person asked for the drugs, but Huddleston asked them, "what kind of drugs?" They said they did not care, and, because Huddleston had marijuana, the car pulled into the Mr. Burger vacant parking lot. The individuals in the car purchased marijuana from one of the other individuals, Ja Marable, and Huddleston moved to walk away from the transaction.

Huddleston testified that he heard the Defendant say "set it out," a phrase that is commonly used in the context of a robbery. He then heard the Defendant fire a shot into the car. The four young men then ran from the scene. Huddleston testified that the gun was a black .38 Special and that neither he nor Ja Marable or Ta Marable had a weapon. They were not aware that the Defendant was going to rob and shoot the passengers in the car.

Huddleston further testified that Rosalyn Blakely is his aunt, his mother's sister. Huddleston stated that, after the shooting, he went home and discussed the situation with his mother and Blakely. They took Huddleston to Detective Coleman the next day, and Huddleston gave the detective the name "Ty" because he did not know the Defendant's real name.

On cross-examination, Huddleston admitted that he previously testified that the Defendant was wearing a black shirt. Huddleston also admitted that he was selling drugs that night, and his mother made him go to the police. Huddleston stated that he had convictions in juvenile court of theft and attempted theft. When questioned about their relative heights, Huddleston stated that he was the tallest, Ta Marable the second tallest, then the Defendant, and Ja Marable the shortest. Huddleston admitted that he had

been friends with the Marable brothers for some time, and after the shooting the three of them again met up that night to "hang out."

Officer Claude W. Mann testified that he was "working radar" at Fourth and Lafayatte in Nashville when he stopped a truck. As he was talking to the individuals in the truck, a woman, Rosalyn Blakely, who Officer Mann knew from working the area, yelled at him. Blakely said that she wanted to tell him about something that had been worrying her: she had information about the shooting of the victim in this case. Officer Mann called for a detective, Todd Watson, who arrived and talked with Blakely.

Jacarlvis ("Ja") Marable testified that he was thirteen years old. He stated that he was with his brother, Ta, DeEarl Huddleston, and the Defendant the night of July 7, 2004. They were proceeding home when they crossed Lafayette Avenue. A car stopped because the four of them were in the road, and someone from the car yelled at them to move. Someone from the car also asked the young men whether they had drugs, and the car then pulled into the Mr. Burger parking lot. Huddleston and the Defendant first approached the car, but Ja Marable and Ta Marable did not immediately approach the car because their cousin, Neecy Marable, called to them. The route to Neecy Marable's house took them past the car stopped at the Mr. Burger. They stopped briefly at the car and saw Huddleston hand the passengers marijuana.

Ja Marable then testified that he saw the Defendant pull out a gun, and he heard Huddleston say, "give me everything." Marable said, "the car tried to pull off, and the gunshot went off, I don't know if the car hit the gun and made the gunshot go off or he pulled the trigger or whatever, I don't know, it was either one." Marable stated that he knew he and his brother did not have a weapon, but he did not know whether Huddleston had one. After the

shooting, Marable and his brother went one direction and Huddleston and the Defendant went another. Marable testified he spoke with Detective Coleman the next day. At that time, he was shown a picture line-up, and Marable identified the Defendant as the shooter.

On cross-examination, Marable testified that the Defendant was wearing a black shirt. Marable's brother, Ta, had his hair half braided, half out, because "he was taking it down." Marable affirmed that he did not sell any drugs and that Huddleston was part of the robbery.

Detective Hugh Coleman testified that he was first contacted about a shooting around midnight on July 7, 2004. He responded to Centennial Hospital where he found the victim already deceased. He interviewed the other passengers in the early morning hours of July 8, and then, accompanied by Paul Puckett and Kandice Smith, he found the crime scene. The next day, July 9, 2004, a patrol officer was flagged down and told of a witness, DeEarl Huddleston. After interviewing Huddleston, they interviewed Ja Marable who identified the Defendant from a picture line-up. Next, Candace Smith also identified the Defendant from a photo line-up. Paul Puckett was shown a line-up, and he identified two possible individuals, one being the Defendant. Kathy Smith was unable to identify anyone.

Detective Coleman testified that the Defendant and his parents arrived at the criminal justice center in order to meet with him on July 9. The Defendant's mother requested an attorney, so Detective Coleman did not question him that night. Detective Coleman did talk with the Defendant's mother about the process. At some point in the discussion, Detective Coleman began to describe what he had heard about the incident. Detective Coleman stated that the car pulled up and asked, "Do you have anything for me?" Detective Coleman testified that the

Defendant then sat up and excitedly said, "Yes, he did, that's what he said."

Detective Coleman testified that he interviewed Ta Marable on July 12 but that he ultimately determined that none of the other three young men would be charged with a crime. He believed that none of the three knew the Defendant had a weapon or that they participated in the robbery. Detective Coleman admitted that he did not create a photo line-up with any of the other three young men in it. Detective Coleman stated that the police never recovered a weapon.

On cross-examination, Detective Coleman testified that Paul Puckett told him, in his interview four hours after the shooting, that the shooter was the tallest of the group and wore a red shirt. Puckett also told Detective Coleman that the shooter had braids and the gun was black with a brown handle. Detective Coleman stated he did not prepare a line-up with pictures of individuals with braids because he did not have a picture of the Defendant in braids. Additionally, he admitted he did not prepare a line-up for the victim's family members with any of the other three young men in it. Although he was not totally sure, Detective Coleman agreed that Ja Marable was probably the shortest, and Huddleston and Ta Marable were the tallest of the group.

Detective Coleman testified that, during the course of the investigation, he came across the name "Danesa Nelson" as the person to whose house the Marable brothers went after the shooting. Detective Coleman admitted he did not attempt to locate or interview Nelson. Detective Coleman testified that one could see the interstate from the Mr. Burger parking lot. He admitted that there was no physical evidence linking the Defendant to the shooting, and the young men likely discussed the shooting at some point after it occurred.

Dr. Staci Turner testified that she performed the autopsy on the victim in this case. The victim died from a gunshot wound that entered his neck and proceeded through his chest cavity, a normally fatal wound. Based on the nature of the wound, Dr. Turner stated that the gun was approximately one to three feet away from the victim when it was fired. Because Dr. Turner found blood in the victim's lungs, she determined he lived a short time after he was shot.

On cross-examination, Dr. Turner testified that it would be possible for gunshot residue to get on the shooter. From the angle of the entry wound, it appeared that the shooter was standing when the shot was fired.

*State v. Vaughn*, 2008 WL 110094, at **1–5 (Tenn. Crim. App. Jan. 9, 2008).

At sentencing, the state trial court merged the reckless homicide and felony murder convictions, and it sentenced Vaughn to life in prison with the possibility of parole on that merged charge. (*See* ECF #20-1 at 49–50.) The trial court also ordered that the sentences for Vaughn's other convictions – which ranged from 4 years to 18 years – run concurrently with the life sentence for felony murder. (*See id.* at 51, 53-54.)

Vaughn thereafter moved for a new trial, which the state trial court denied. (*See* id. at 62-63.) Vaughn then appealed his conviction. Vaughn raised four claims on appeal:

(1) the State committed a *Brady* violation, entitling him to a new trial; (2) the trial court erred in refusing to admit

> evidence of the victim's toxicology report; (3) the State
> presented insufficient evidence to support the Defendant's
> conviction for felony murder; and (4) the trial court erred
> in refusing to grant a motion for judgment of acquittal as
> to the first-degree premeditated murder charge.

*Vaughn*, 2008 WL 110094, at *1. Following "a thorough review of the record," the

Tennessee Court of Criminal Appeals "affirm[ed] the judgments of the trial court."

*Id.* The Tennessee Supreme Court denied discretionary review of Vaughn's direct

appeal on June 2, 2008. (*See* ECF #20-13.)

After Vaughn exhausted his direct appeals, he filed a *pro se* petition for post-

conviction relief in the state trial court on April 7, 2009. (*See* ECF #20-14 at 29–33.)

On May 19, 2009, the trial court *sua sponte* dismissed the petition as untimely. The

trial court held that Vaughn's petition did not comply with Tenn. Code Ann. § 40-

30-102(a), which requires post-conviction petitions to be filed "within one (1) year

of the date of the final action to [sic] the highest state appellate court to which an

appeal is taken or, if no appeal is taken, within one (1) year of the date on which the

judgment became final." (*Id.* at 34–35 (quoting Tenn. Code Ann. § 40-30-102(a)).)

On March 24, 2010, citing a *pro se* motion to reconsider that does not appear in the

record, the trial court reversed its decision and announced that it was then "of the

opinion the original petitioner [sic] was timely filed." (*Id.* at 36.) The trial court

appointed counsel for Vaughn and set the petition for a hearing. (*See id.*)

11

The State then filed a motion to dismiss the petition on the basis that it "was plainly filed after the statute of limitation had expired." (*Id.* at 42–43.) The court held an evidentiary hearing on September 7, 2011, and took the matter under advisement. (*See id.* at 47.) On August 26, 2014, the trial court denied relief on the merits of Vaughn's claims. (*See id.* at 48–60.) In the court's order, it referred to its previous reconsideration of the timeliness issue as "inexplicable" and said that it had only considered the merits of Vaughn's petition because of the confusion the court had created by reversing its initial dismissal. (*Id.* at 60.) Neither the trial court's orders nor the State's motion identified the operative dates on which they relied to determine when the limitations period began or expired.

Vaughn appealed the denial of his petition for post-conviction relief, and both parties briefed the merits of his issues on appeal. (*See* ECF ## 20-17, 20-18.) When the Tennessee Court of Criminal Appeals resolved Vaughn's appeal, it did not address the merits of his claims. Instead, the appellate court incorrectly concluded that Vaughn's convictions had become final thirty days after they were affirmed on January 9, 2008, and it therefore held that his petition was untimely.[1] (*See* ECF #20-

---

[1] The syllabus preceding the appellate court's opinion incorrectly provides that Vaughn did not seek discretionary review of the Tennessee Court of Criminal Appeals' January 9, 2008, decision in the Tennessee Supreme Court. This suggests that, like the post-conviction trial court (and apparently the attorneys on both sides),

19 at 13-14.)

After Vaughn attempted, and failed, to have the Court of Criminal Appeals recall its mandate to allow him to take a delayed appeal, he filed a *pro se* application for discretionary review in the Tennessee Supreme Court on May 18, 2016. (*See* ECF #20-20.)  The Tennessee Supreme Court denied his application on August 18, 2016. (*See* ECF #20-22.)

## II

Vaughn deposited his federal habeas petition in the prison mailroom for filing on September 23, 2016. (*See* ECF #1-1.)  Respondent acknowledges that the petition is timely. (*See* ECF #21 at 2.)  The petition is internally inconsistent and difficult to follow, but it appears to assert five claims for relief:

1. The prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), when it turned over key evidence two days before trial. (*See* ECF #1 at 5.)

2. The trial court wrongfully excluded evidence of the victim's toxicology report. (*See id.* at 6.)

3. The trial court wrongfully denied Vaughn's motion for judgment of acquittal on the charge of first-degree premeditated murder. (*See id.* at 8.)

---

the appellate court somehow was unaware of the Tennessee Supreme Court's June 2, 2008, ultimate refusal to grant discretionary review.

4. Trial counsel was ineffective for failing to hire an expert on eyewitness identification. (*See id.* at 9.)

5. Vaughn's constitutional rights were violated by the use of juvenile/family court records to convict him as an adult. (*See id.* at 5, 10.)

### III

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529

14

U.S. 362, 405-06 (2000). An "unreasonable application" of clearly established federal law occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id*. at 409. To obtain habeas relief, a state prisoner must show that the state court's rejection of his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington, Richter*, 562 U.S. 86, 103 (2011).

## IV

## A

Vaughn first claims that the State violated his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), when it turned over key, potentially exculpatory evidence, two days before trial. (*See* ECF #1 at 5.) Specifically, Vaughn insists that the late disclosure of certain videotaped interviews with witnesses violated *Brady*'s prohibition on suppressing "evidence favorable to the accused." *Brady*, 373 U.S. at 87. In order to establish a *Brady* violation, a defendant must show that "[t]he evidence at issue [was] favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence [was] suppressed by the State, either willfully or inadvertently; and [that the defendant suffered] prejudice." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

The Tennessee Court of Criminal Appeals reviewed this claim on direct appeal and rejected it:

> First, the Defendant asserts that the State committed a *Brady* violation when it furnished the Defendant with six videotaped interviews of witnesses two days before trial. Under the United States Supreme Court decision of *Brady v. Maryland*, 373 U.S. 83 (1963), a criminal defendant, upon request, has a right to material evidence in the possession of the State. *Id.* at 87. In order to establish a violation of Brady, four requirements must be met:
>
> > 1. The Defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information, whether requested or not);
> >
> > 2. The state must have suppressed the information;
> >
> > 3. The information must have been favorable to the accused; and
> >
> > 4. The information must have been material.
>
> *State v. Biggs*, 218 S.W.3d 643, 659 (Tenn. Crim. App. 2006); *see State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995).
>
> "The defendant has the burden of proving a constitutional violation by a preponderance of the evidence." *Biggs*, 218 S.W.3d at 659 (citing *State v. Spurlock*, 874 S.W.2d 602, 610 (Tenn. Crim. App. 1993)). "Demonstrating a constitutional violation requires the defendant to show that without the omitted material he has been denied the right to a fair trial." *Id.* (citing *United States v. Agurs*, 427 U.S. 97, 108 (1976)). "In other words, the inquiry is whether we can be confident that the jury's verdict would have been

the same if the state had disclosed the favorable evidence to the defendant." *Id.* (citing *Kyles v. Whitley*, 514 U.S. 419, 453 (1995).

The State asserts that it did not "suppress" the video tapes; it merely delayed furnishing the Defendant with the tapes. We agree with the State.

Tennessee courts analyze delayed disclosure differently from outright suppression, focusing on the prejudice of the delay. In *United States v. Blood*, the Sixth Circuit stated, "*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose and that a [d]elay only violates *Brady* when the delay itself causes prejudice." 435 F.3d 612, 627 (6th Cir. 2006) (citing *United States v. Bencs*, 28 F.3d 555, 560–61 (6th Cir. 1994)) (quotations omitted); *see State v. Caughron*, 855 S.W.2d 526, 548 (Tenn. 1993) (Daughtrey, J., dissenting) ("'no violation occurs as long as *Brady* material is disclosed to a defendant in time for its effective use at trial.'") (quoting *United States v. Smith Grading & Paving, Inc.*, 760 F.2d 527, 532 (4th Cir. 1985) (citing *United States v. Higgs*, 713 F.2d 39 (3d Cir. 1983))), *cert. denied sub nom. Dellinger v. United States*, 474 U.S. 1005 (1985); *State v. Larry Boykin*, No. E2005–01582–CCA–R3–CD, 2007 WL 836807, at *13 (Tenn. Crim. App., at Knoxville, Mar. 12, 2007).

In our view, the Defendant was furnished with the tapes in time to use them effectively at trial. The tapes contained statements concerning, among other things, what the shooter was wearing, and this information was used to cross-examine witnesses quite thoroughly. Additionally, we note that the Defendant did not complain of the late disclosure at trial. Relief will not be granted when the Defendant failed to take the appropriate action at the trial level. See Tenn. R. App. P. 36(a). The Defendant failed to notify the trial court that he could not effectively proceed

> with trial because of the late disclosure. The failure to request a continuance constitutes waiver. The Defendant is not entitled to relief on this issue.

*Vaughn*, 2008 WL 110094, at ** 6–7.

Vaughn has not shown that the Tennessee appellate court's ruling was an unreasonable application of clearly established federal law.[2]  Indeed, Vaughn has not identified any Supreme Court decision that found a *Brady* violation under facts similar to those here.

Moreover, and in any event, it was not unreasonable for the Tennessee appellate court to conclude that Vaughn failed to show prejudice from the delayed disclosure.  To establish the required prejudice, "*Brady* requires a showing that there is a reasonable probability that had the evidence been timely disclosed to the defense the outcome would have been different." *United States v. Garner*, 507 F.3d 399, 405 (6th Cir. 2007) (internal quotation marks omitted).  Here, as the Tennessee appellate

---

[2] Respondent argues that the state court's finding that Vaughn had waived this claim means that the claim is procedurally defaulted and not subject to habeas review. (*See* ECF #21 at 22–23.)  The Court disagrees.  When a state court has ruled on a petitioner's claim in a decision that "fairly appear[s] to rest primarily on federal law or to be interwoven with federal law," federal habeas courts are to presume that the ruling was on the merits of the claim unless the state court "clearly and expressly rel[ied] on an independent and adequate state ground" to reject the claim. *Coleman v. Thompson*, 501 U.S. 722, 735 (1991).  Here, the state court devoted several paragraphs to summarizing Vaughn's claim, and identifying and applying a legal standard to the merits of the claim, before "[a]dditionally . . . not[ing]" the issue of waiver.  Accordingly, the Court will review this claim as an exhausted claim subject to the deference required by AEDPA.

court noted, despite the delayed disclosure of the witness interviews, Vaughn used information from the taped statements "to cross-examine witnesses quite thoroughly" at trial. *Vaughn*, 2008 WL 110094, at \*7. And Vaughn has neither shown that an earlier disclosure of the tapes would have changed the outcome of his trial nor explained how his trial counsel could have made additional use of them if they had been disclosed earlier. Indeed, in state court post-conviction proceedings, Vaughn's trial counsel acknowledged that while "it hurt to get the tapes [so] close to trial," she could not identify and did not know of any leads that she was unable to follow or any beneficial evidence that she was unable to present because of the late disclosure. (ECF #20-15 at 34-35, 61-62.) Vaughn's counsel also testified that if she had the opportunity to try the case again, she would not have done anything differently. (*See id.* at 46-47.) Under these circumstances, it was not unreasonable for the state appellate court to conclude that Vaughn had failed to establish prejudice from the delayed disclosure. For all of these reasons, Vaughn is not entitled to relief on this claim.

**B**

Vaughn next alleges that the trial court erred when it refused to admit evidence of a toxicology report that showed the victim had drugs and alcohol in his system at the time of his death. (*See* ECF #1 at 6.) The Tennessee Court of Criminal Appeals

reviewed this claim on direct appeal and rejected it:

> Finally, the Defendant complains that the trial court erred in refusing to allow him to present evidence of the victim's toxicology report that would show the victim had marijuana, anti-depressants, and alcohol in his system at the time of his death. The Defendant asserts that this evidence would have shown the jury that the witnesses from the car were untruthful in their testimony that they were merely looking for directions, and that, therefore, these witnesses may well have also been untruthful in implicating the Defendant in these crimes.

> Determinations made about the admissibility of evidence rests within the sound discretion of the trial court and that decision will not be disturbed absent a showing of an abuse of discretion. *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004); *see State v. James*, 81 S.W.3d 751, 760 (Tenn. 2002). We will not find an abuse of discretion unless it appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning and caused an injustice to the party complaining. *See James*, 81 S.W.3d at 760; *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997).

> The specific piece of evidence in issue, the toxicology reports, the court determined to be propensity evidence. See Tenn. R. Evid. 404(b). However, under *State v. Stevens*, Rule 404(b) does not apply to the victim or witnesses in this case. 78 S.W.3d 817, 836–37 (Tenn. 2002). The *Stevens* Court stated, "'Evidence of crimes, wrongs or acts, if relevant, [is] not excluded by Rule 404(b) if [the acts] were committed by a person other than the accused.'" *Id.* at 837 (quoting *State v. DuBose*, 953 S.W.2d 649, 653 (Tenn. 1997)).

> Thus, it would appear the only exclusionary rule that applies here is Rule 403. Rule 403 states that relevant

"evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." It does not appear that this rule would exclude the evidence sought to be admitted in this case, thus, it was error to prevent the admission of the testimony.

"Nevertheless, while the court erred in excluding this testimony, we look at the effect of that error on the trial by evaluating that error in light of all of the other proof introduced at trial." *Stevens*, 78 S.W.3d at 837 (citing *State v. Gilliland*, 22 S.W.3d 266, 274 (Tenn. 2000)). "'The more the proof exceeds that which is necessary to support a finding of guilt beyond a reasonable doubt, the less likely it becomes that an error affirmatively affected the outcome of the trial on its merits.'" *Id.* (quoting *Gilliland*, 22 S.W.3d at 274).

The Defendant was attempting to introduce a toxicology report that would state the victim had marijuana in his system at the time of his death. The victim's use of marijuana would make it more likely that the group was actually purchasing marijuana from the four young men, rather than seeking directions as the other car passengers testified. The Defendant argues that this would impeach the credibility of those witnesses, thereby calling into question their testimony that the Defendant shot Carlyle. We conclude this argument is too tenuous to have had any affirmative affect at trial in the face of numerous eyewitness statements linking the Defendant to the crime. Thus, we conclude the error was harmless. *See Spicer v. State*, 12 S.W.3d 438, 447–48 (Tenn. 2000) ("[T]he line between harmless and prejudicial error is in direct proportion to the degree ... by which proof exceeds the standard required to convict....' ").

As we have found harmless error in excluding the testimony, we need not address in depth the Defendant's due process claim that he was denied the right to present a defense. *See State v. Flood*, 219 S.W.3d 307, 316–17 (Tenn. 2007); *see also Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *State v. Brown*, 29 S.W.3d 427, 431 (Tenn. 2000). In determining whether an exclusion of evidence rises to the level of a constitutional violation, we are directed to consider the following: (1) Whether the excluded evidence is critical to the defense; (2) Whether the evidence bears sufficient indicia of reliability; and (3) Whether the interest supporting the exclusion of evidence is sufficiently important. *Flood*, 219 S.W.3d at 317 (citations omitted). Harmless error requires a finding that the error did not affect the outcome of the trial. Thus, by nature, the evidence was not "critical to the defense." Additionally, Huddleston and Marable's testimony that the group was there to purchase drugs allowed the Defendant to make the same argument. We conclude that the evidence fails the *Flood* test, and his constitutional right to present a defense was not violated.[3] The Defendant is not entitled to relief on this issue.

*Vaughn*, 2008 WL 110094, at ** 9–10 (Tenn. Crim. App. Jan. 9, 2008).

The Tennessee appellate court's ruling was not an unreasonable application of clearly established federal law.[4]    The Supreme Court has repeatedly held that

---

[3] In *Flood*, the Tennessee Supreme Court reviewed, among other things, whether the defendant's due process right to present a defense was violated under *Chambers*. *See Flood*, 219 S.W.2d at 316, 315-16.

[4] Respondent argues that this claim is not cognizable in a federal habeas action because "Petitioner [has] simply renew[ed] his direct appellate argument centering on state evidentiary law and fail[ed] to connect this claim to a violation of his federal rights." (ECF #21 at 23.)  The Court disagrees.  Respondent ignores the fact that Vaughn's primary argument in connection with this claim on direct appeal was that

"the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Nevada v. Jackson*, 569 U.S. 505, 509 (2013) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). "But only rarely [has the Supreme Court] held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Id.* For example, in *Chambers*, the Supreme Court found such a violation where the defendant had been prevented from presenting evidence that was "critical" to his defense – specifically, testimony about a third party's repeated confessions to the murder for which the defendant was on trial. *Chambers*, 410 U.S. at 302.

Here, it was not unreasonable for the state appellate court to conclude that the toxicology report was not "critical" to Vaughn's defense. Indeed, Vaughn did not need the report to raise the defense that the victim and his companions were looking to buy drugs on the night of the victim's death, and Vaughn could and did provide other evidence that supported that defense. As the state appellate court aptly pointed out, because Vaughn was able to present "Huddleston and Marable's testimony that the [victim's] group was there to purchase drugs," Vaughn was able to "make the

_____

the exclusion violated his constitutional right to present a complete defense as recognized in *Chambers v. Mississippi*, 410 U.S. 284 (1973) (*See* ECF #20-9 at 20–21), and that the Tennessee Court of Criminal Appeals expressly addressed the federal *Chambers* claim in its decision, quoted in text above. The Court therefore concludes that this claim is cognizable on federal habeas review.

same argument" that he would have made if the trial court had admitted the toxicology report. Moreover, the state appellate court did not unreasonably conclude that while the presence of drugs and alcohol in the victim's system might have further diminished the credibility of the victim's companions, it had no likelihood of changing the outcome of the trial in light of all of the eyewitness testimony against Vaughn. Simply put, the jury could have seen and believed the toxicology report and still concluded, based on the testimony of Vaughn's own companions, that he was the shooter.

For all of these reasons, Vaughn is not entitled to federal habeas relief on this claim.

## C

Vaughn next argues that the state trial court erred when it denied his motion for judgment of acquittal on the charge of first-degree premeditated murder.[5] (*See* ECF #1 at 8.) The jury did not ultimately convict Vaughn of that charge. Instead,

---

[5] The Court has been unable to locate either the motion or the trial court's ruling in the trial transcript, which appears to be incomplete. For example, the final volume of trial transcript ends abruptly in mid-sentence of closing argument. (*See* ECF# 20-5 at 101.) Accordingly, the Court relies on Vaughn's brief on direct appeal for the fact that he sought a judgment of acquittal. Although the brief does not cite any portion of the record for the motion (noting that the record would have to be supplemented), the state's response brief on direct appeal did not contest that fact or assert that the issue had been waived. (*See* ECF #22-2 at 21.)

it found him guilty of the lesser included offense of reckless homicide, which the trial court then merged with his conviction for first-degree felony murder. (*See* ECF #20-1 at 49.)

Vaughn exhausted this claim on direct appeal, and the Tennessee Court of Criminal Appeals rejected it:

> The Defendant next contends that the trial court erred in denying the Defendant's motion for a judgment of acquittal on the first-degree premeditated murder charge. Premeditation is defined by statute as follows:
>
>> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.
>
> T.C.A. § 39–13–202(d). Although we are inclined to agree that the State did not present evidence to support premeditation, the Defendant was ultimately acquitted of first-degree premeditated murder and convicted of felony murder. Any error by the trial court is, therefore, harmless. See Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a). The Defendant is not entitled to relief on this issue.

*Vaughn*, 2008 WL 110094, at *9.

Vaughn has not presented any argument as to how the state appellate court's ruling was contrary to, or an unreasonable application of, clearly established federal law, and he has not cited any Supreme Court precedent that would support such an argument. Nor has he demonstrated that the state appellate court erred in concluding that he was not prejudiced by the trial judge's failure to acquit him for a crime for which he was still ultimately acquitted. Vaughn is therefore not entitled to federal habeas relief on this claim.

## D

Vaughn next alleges that his trial counsel rendered ineffective assistance when counsel failed to retain an expert on eyewitness identification. (*See* ECF #1 at 8.) Respondent argues that Vaughn procedurally defaulted this claim when Vaughn failed to raise it on appeal from the trial court's denial of post-conviction relief. (*See* ECF #21 at 25–26.) However, because the underlying merits of Vaughn's ineffective assistance claim are easily resolved, the Court will consider them. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). *See also Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (proceeding directly to merits analysis because "the question of procedural default presents a complicated question . . . and is unnecessary to our

disposition of the case").

Federal claims of ineffective assistance of counsel are subject to the deferential two-prong standard of *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* asks: (1) whether counsel was deficient in representing the defendant; and (2) whether counsel's alleged deficiency prejudiced the defense so as to deprive the defendant of a fair trial. *See id.* at 687. To meet the first prong, a petitioner must establish that his attorney's representation "fell below an objective standard of reasonableness," and must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" *Id.* at 688, 689. The "prejudice" component of a *Strickland* claim "focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). Prejudice, under *Strickland*, requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Vaughn has not satisfied either component described in *Strickland*. First, he has not established that his trial counsel acted unreasonably when counsel failed to

retain an expert in eyewitness identification. Vaughn argues that he was identified by a "white female that only had a very brief opportunity to view the shooter," and his defense could have benefited from an expert who "could have educated the jury regarding the deficiencies regarding eyewitness identification, especially when the eyewitnesses and subject are different races." (ECF #1 at 9, incorporating ECF #20-14 at 39.) But he ignores the fact that Huddleston and Marable – two people who were personally acquainted with him and were with him the night of the murder – also identified him and testified that he was the shooter. Whatever "deficiencies regarding eyewitness identification" an expert might have attributed to the victim's companion would have no bearing on the fact that two people who knew Vaughn testified that they saw and heard what he did that night. Therefore, it was not unreasonable for counsel to conclude that there was no need for an expert in eyewitness identification.

Second, for many of these same reasons, Vaughn has failed to establish that he suffered prejudice from counsel's decision not to hire an eyewitness identification expert. Vaughn simply has not shown that, given all of the other evidence introduced against him at trial – including the identification testimony from Huddleston and Marable described above – there was a reasonable likelihood that expert eyewitness identification testimony would have changed the outcome of his trial. Vaughn

therefore has failed to show that his counsel was ineffective under *Strickland*, and he is not entitled to federal habeas relief on this claim.

## E

Finally, although it is only obliquely presented in the petition, Vaughn has devoted the bulk of his briefing to the claim that his convictions and sentences are "void and illegal" because facts raised in his juvenile proceedings were used against him at his criminal trial, and that trial counsel "defaulted" this issue. (*See* ECF #1 at 5, 10; ECF #68 at 3–12.)  Vaughn acknowledges that his post-conviction counsel failed to raise this issue. (*See id.* at 5.)  The Court therefore construes this to be a claim that Vaughn's trial counsel was ineffective for failing to object to the improper use of facts from Vaughn's juvenile proceeding at trial.[6]  As with Vaughn's ineffective assistance claim analyzed in sub-paragraph D above, because this claim is easily resolved, and the issue of procedural default is not, the Court will proceed directly to the merits of Vaughn's claim. *See Hudson*, 351 F.3d at 216; *Ferensic v.*

---

[6] Respondent contends that Vaughn has presented a free-standing claim of ineffective assistance by Vaughn's *post-conviction* counsel. (*See* ECF #21 at 28.) The Court disagrees.  Vaughn's reply brief confirms the Court's construction that this claim relates to his *trial* counsel's ineffectiveness: "Petitioner's post conviction counsel failed to raise the issue of *trial counsel's constitutionally ineffective representation* in her failure to object to the use of inadmissible evidence [from juvenile proceedings] at time of the Petitioner's trial." (ECF #68 at 11; emphasis added.)

*Birkett*, 451 F.Supp.2d 874, 887 (E.D. Mich. 2006) (performing *de novo* review of unexhausted habeas claim because "it is easier to address the merits of Petitioner's claim than to perform a procedural default analysis").

Vaughn asserts that his trial counsel erred when counsel failed to object, at Vaughn's murder trial, to testimony by a witness who had earlier testified in Vaughn's juvenile proceedings. In order to fully understand this claim, some background is required. Vaughn was 15-years-old at the time of the murder, so he originally appeared in juvenile court before being transferred to criminal court. (*See* ECF #20-15 at 8, 16–17, 20.) The juvenile court held two hearings on Vaughn's case, a detention hearing and a transfer hearing. Ja Marable testified at both hearings. (*See* ECF #20-15 at 18.) Based in part on the testimony of Ja Marable, the juvenile court found that there was sufficient probable cause to transfer Vaughn to the criminal court. During Vaughn's criminal trial, Ja Marable testified again and told the same version of events that he offered in his testimony during Vaughn's juvenile proceedings.

Vaughn now insists that his trial counsel should have objected when Ja Marable offered the same testimony at Vaughn's criminal trial that he had earlier offered at Vaughn's juvenile proceedings. Vaughn claims that the introduction of this evidence violated a Tennessee juvenile proceedings statute, which the Court

quotes in its entirety for context:

> 37-1-133. Order of adjudication – Noncriminal.
>
> (a)  An order of disposition or other adjudication in a proceeding under this part is not a conviction of crime and does not impose any civil disability ordinarily resulting from a conviction or operate to disqualify the child in any state service or civil service application or appointment. A child shall not be committed or transferred to a penal institution or other facility used primarily for the execution of sentences of persons convicted of a crime, except as provided in § 37-1-134.
>
> (b)  The disposition of a child and evidence adduced in a hearing in juvenile court may not be used against such child in any proceeding in any court other than a juvenile court, whether before or after reaching majority, except in dispositional proceedings after conviction of a felony for the purposes of a pre-sentence investigation and report.
>
> (c)  A child found to be delinquent shall be exempt from the operation of laws applicable to infamous crimes, and such child shall not be rendered infamous by the judgment of the juvenile court in which such child is tried.

The Court is not persuaded that Vaughn's trial counsel was ineffective when counsel failed to object to Ja Marable's testimony at Vaughn's criminal trial based on this statute.  Vaughn has cited no Tennessee (or other) authority for the proposition that the statute bars a witness who testified at a juvenile proceeding from offering the same testimony at a later criminal proceeding.  Indeed, Tennessee state courts appear to have recognized that there can and will be overlap between the facts

introduced at these two proceedings. *See*, *e.g.*, *State v. Sexton*, 2002 WL 1787946, at *6 (Tenn. Crim. App. Aug. 2, 2002) ("The evidence presented at the transfer hearing pertaining to the shooting of the victim and the Defendant's involvement in the crime was similar to the evidence later presented at trial.").  Moreover, when Ja Marable testified at Vaughn's criminal trial, he was not providing evidence that was "adduced" at the juvenile proceeding; he was providing new evidence though the admission of new testimony.  Simply put, Vaughn has not convinced the Court that the statute barred the testimony at issue here nor that Vaughn's trial counsel was ineffective for failing to object to Ja Marable's trial testimony on this basis.

For the same reasons, there is no purpose served by expanding the record in this case to include Vaughn's juvenile court transcripts to "compar[e] this testimonial evidence from the juvenile hearings and the testimonial evidence from the Petitioner's trial." (ECF #68 at 10.) Accordingly, Vaughn's motion to expand the record (ECF #25-1) will be denied, and Vaughn is not entitled to federal habeas relief on this claim.

As Vaughn has failed to demonstrate entitlement to federal habeas relief with respect to any of his claims, the Court will deny the petition.

## V

In order to appeal the Court's decision, Vaughn must obtain a certificate of appealability. To obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *See Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). A federal district court may grant or deny a certificate of appealability when the court issues a ruling on the habeas petition. *See Castro v. United States*, 310 F.3d 900, 901 (6th Cir. 2002).

Here, jurists of reason would not debate the Court's conclusion that Vaughn has failed to demonstrate entitlement to habeas relief with respect to any of his claims because they are all devoid of merit. Therefore a certificate of appealability will be denied.

Although this Court declines to issue Vaughn a certificate of appealability, the standard for granting an application for leave to proceed *in forma pauperis* on appeal is not as strict as the standard for certificates of appealability. *See Foster v. Ludwick*, 208 F.Supp.2d 750, 764 (E.D. Mich. 2002). While a certificate of

appealability may only be granted if a petitioner makes a substantial showing of the denial of a constitutional right, a court may grant *in forma pauperis* status if it finds that an appeal is being taken in good faith. *See id.* at 764-65; 28 U.S.C. § 1915(a)(3); Fed. R.App.24 (a). Although jurists of reason would not debate this Court's resolution of Vaughn's claims, an appeal could be taken in good faith. Therefore, Vaughn may proceed *in forma pauperis* on appeal.

## VI

Accordingly, for the reasons stated above, the Court 1) **DENIES WITH PREJUDICE** Vaughn's petition for a writ of habeas corpus (ECF #1), 2) **DENIES** Vaugn's motion to expand the record (ECF #25-1), 3) **DENIES** Vaugn a certificate of appealability, and 4) **GRANTS** Vaughn permission to appeal *in forma pauperis*.

**IT IS SO ORDERED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE
SITTING BY SPECIAL DESIGNATION


Dated:  August 6, 2018